**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lucy Pinder, et al., | No. CV-18-02503-RCC |
| Plaintiff, | **ORDER** |
| v. | |
| 4716 Incorporated, et al., | |
| Defendant. | |

Pending before the Court are Defendant's Motions to Exclude Martin Buncher (Doc. 78) and Stephen Chamberlin (Docs. 80, 91), and Plaintiffs' Motion to Strike the Expert Report and Testimony of Michael Einhorn (Doc. 79). This matter has been fully briefed. (Docs. 78–80, 92–93, 96, 101, 103–04.) The Court finds oral argument will not aid in the resolution of the issues raised. See LRCiv 7.2(f); Fed. R. Civ. P. 78(a); *Mahon v. Credit Bur. Of Placer Cty.*, 171 F.3d 1197, 1200 (9th Cir. 1999). Plaintiffs have since withdrawn their motion to strike Dr. Einhorn's report and testimony. As fully set forth below, the Court denies all remaining motions.

Plaintiffs Lucy Pinder, Ana Cheri, and Irina Voronina ("Plaintiffs")[1] raise state law claims of right of publicity/misappropriation of likeness and false light/invasion of privacy. They also raise claims under the Lanham Act for false advertising and false association. Plaintiffs allege that Defendant 4716, Inc. d/b/a Hi Liter ("Defendant" or "Hi Liter") unlawfully used Plaintiffs' photographs to advertise its strip club by posting the

---

[1] Plaintiff Abagail Ratchford was dismissed on April 28, 2020. (Doc. 67.)

photographs to Defendant's Facebook without permission. Plaintiffs claim that the use of their photographs created the false appearance that they were somehow associated with, approved of, or were entertainers at Hi Liter. Furthermore, Plaintiffs assert that, because Defendant did not pay them for the photo shoots, it deprived Plaintiffs of the income they would have received but for Defendant's unlawful use of the photographs. Plaintiffs seek actual damages, disgorgement of profits, treble damages, punitive damages, compensatory damages, reasonable attorneys' fees, costs, and interest. (Doc 1-3 at 19.)

The parties have retained their respective experts in this matter. Plaintiffs retained Martin Buncher to conduct a survey to measure the likelihood of consumer confusion resulting from Defendant's use of Plaintiffs' photographs. Plaintiffs also retained Stephen Chamberlin to establish actual damages. Defendant retained Michael Einhorn to rebut Mr. Chamberlin's valuation. All experts have been challenged by the opposing party.

**I.  Standard of Review – Expert Testimony**

As a threshold matter, "evidence is admissible so long as (1) it is relevant, and (2) it is not otherwise inadmissible under, *inter alia*, the Federal Rules of Evidence." *United States v. Evans*, 728 F.3d 953, 960 (9th Cir. 2013) (citing Fed. R. Evid. 402). Federal Rule of Evidence 702 outlines when proposed expert testimony is admissible. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93, n.10 (1993). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The party seeking to present expert testimony has the burden of showing by a preponderance of the evidence that the expert is qualified and that his or her evidence is admissible. *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000). "The qualification standard is meant to be broad and seek a 'minimal foundation' justifying the expert's role as an expert." *Allen v. Am. Capital Ltd.*, 287 F. Supp. 3d 763, 776 (D. Ariz. 2017) (quoting *Hangarter v. Provident Life & Accident Ins.*, 373 F.3d 998, 1015–16 (9th Cir. 2004)). Years of relevant experience can establish the necessary "minimal foundation." *See Hangarter*, 373 F.3d at 1015–16 (finding that twenty-five years of working as an independent consultant and an expert witness in the insurance industry satisfied the "minimal foundation" necessary to provide expert testimony). "Disputes as to the strength of [an expert's] credentials . . . go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)).

Additionally, in order to be admissible, expert testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 589. A court has broad discretion in deciding whether to permit a proposed expert's testimony, but it "cannot abdicate its role as gatekeeper" by leaving the determination of relevance or reliability to the fact finder. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 464 (9th Cir. 2014). This gatekeeping role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Nonetheless, "Rule 702 was not meant to supplant 'the traditional and appropriate means of attacking shaky but admissible evidence,' including '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Gray, et al. v. LG&M Holdings LLC, et al.,* No. CV–18–02543–PHX–SRB, Doc. 121 at 16 (D. Ariz. Sept. 3, 2020) (quoting *Daubert*, 509 U.S. at 596).

    a. Relevance

In general, evidence is relevant if it "has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence.'" *Daubert*, 509 U.S. at 587 (quoting Fed. R. Evid. 401). An expert's testimony must also "logically advance[] a material aspect of the proposing party's case" to qualify as relevant. *Daubert v. Merrell Dow Pharms. (Daubert II)*, 43 F.3d 1311, 1315 (9th Cir. 1995).

### b. Reliability

A court's inquiry into whether expert testimony is reliable is "a flexible one." *Estate of Barabin*, 740 F.3d at 463. The court may look at the reliability of the report prepared by the expert, assessing several factors, including whether the expert's technique or theory (1) can be tested; (2) has been peer reviewed or published; (3) has a known or potential basis for error; and (4) is generally accepted in the pertinent scientific community. *Hankey*, 203 F.3d at 1168.

Additionally, the court may assess the reliability of the expert him- or herself by considering (1) the expert's specialized knowledge, education, skill, or training in an area relevant to the area of testimony; (2) whether the expert's techniques are pertinent to the conclusions presented; and (3) whether the probative value of the expert's opinion is substantially outweighed by unfair prejudice. *Hankey*, 203 F.3d at 1168. The objective "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Here, the proposed experts are each assessed in turn.

**II.   Martin Buncher**

To support Plaintiffs' Lanham Act claims, Plaintiffs wish to present a survey and report produced by Martin Buncher to show that the message communicated by Defendant's advertisements for its strip club caused "consumer confusion as to Plaintiffs' association with, endorsement of, and employment at Hi Liter." (Doc. 92 at 2.) Plaintiffs also believe Mr. Buncher's analysis is relevant to whether the Plaintiffs are recognizable, a consideration in their right of publicity, false light, and false association claims.

### a. Mr. Buncher's Knowledge, Education, Skill, and Training

Mr. Buncher's background reflects fifty-five years of experience conducting research studies in marketing communications. He is active in several groups that promote marketing research. He has contributed to a textbook about marketing communications, and even taught college courses on the subject. Moreover, Mr. Buncher has participated in over twenty studies in similar strip club cases, investigating the role of women in each defendant's advertising. Defendant does not challenge Mr. Buncher's extensive qualifications. The Court finds Mr. Buncher's experience evinces reliability.

### b. Mr. Buncher's Survey

In Mr. Buncher's survey, advertisements similar to those at issue in this case were presented to 302 participants. Selected participants, half of whom were men, resided within the metropolitan area surrounding Hi Liter and had attended strip clubs in the previous two years. Participants were asked a series of questions based on the advertising images.

Based on the results of the survey, Mr. Buncher concluded that (1) 61% of participants thought Plaintiffs were affiliated with Hi Liter; (2) 80% believed Plaintiffs sponsored, endorsed, or promoted Hi Liter; (3) 82% presumed Plaintiffs approved of their images being used in Hi Liter's advertising; (4) 69% believed Plaintiffs were part of the stripper lifestyle; and (5) 66% thought Plaintiffs participated in Hi Liter's activities. Moreover, Mr. Buncher found that around 18% of participants believed they recognized Plaintiffs.

### c. Standard for Admissibility of Surveys

A survey is generally permissible if it is relevant and follows accepted standards in the applicable field. *Wendt v. Host Int'l*, 125 F.3d 806, 814 (9th Cir. 1997). "Challenges to survey methodology go to the weight given the survey, not its admissibility." *Id.* (citing *Prudential Ins. Co. of Am. v. Gibraltar Fin. Corp. of Cal.*, 694 F.2d 1150, 1156 (9th Cir. 1982)). Moreover, issues of "[t]echnical unreliability" go to weight, not admissibility. *See Prudential Ins. Co. of Am.*, 694 F.2d at 1156. This includes "the format of the questions or the manner in which [the survey] was taken." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (citations omitted). Rather

than precluding the testimony due to methodological challenges, a party may debate a survey's alleged inadequacies through vigorous cross-examination. *See Marsteller v. MD Helicopter Inc.*, No. CV–14–01788–PHX–DLR, 2018 WL 3023284, at *1–2 (D. Ariz. May 21, 2018)

      *d. Defendant's Objections*

Defendant objects to allowing Mr. Buncher's testimony, the survey, and the report at trial. Defendant contends Mr. Buncher's testimony is irrelevant and unreliable because (1) the participants in the survey were not potential customers of Hi Liter, (2) the survey does not show Plaintiffs are recognizable, (3) Mr. Buncher's use of a control question rather than a control group clashes with generally accepted survey principles, (4) the survey does not assist a fact finder in determining material facts, and (5) Mr. Buncher's opinion is unfairly prejudicial.

      i. Representative Sample

Defendant initially claims that the survey was not a representative sample of potential Hi Liter clientele. First, the survey was far too broad. Participant selection encompassed areas "hundreds of miles from Hi Liter" and therefore included people who were "unlikely to be potential patrons." (Doc. 78 at 6.) Second, Defendant contends that the survey was not representative because it utilized 50% women, while Hi Liter has less than 5% female customers.

Plaintiffs respond that Hi Liter keeps no patron records, and its email list does not reach enough people for survey purposes. Moreover, Plaintiffs state they did not need to locate actual customers, only potential. Since the survey targeted a random selection of recent strip club patrons residing in the "greater Phoenix metropolitan area," (Doc. 92 at 4), these participants were potential customers, and potential customers are all that is required for Plaintiffs' Lanham Act claim. In addition, Mr. Buncher explained he used 50% women so that he could isolate gender to determine whether the message portrayed in the ads differed by sex.

Defendant raises a methodological argument, and Plaintiffs have adequately

explained the reasoning behind participant selection and provided a logical purpose for the gender ratio. Furthermore, as Defendant did not provide a clientele list to Plaintiffs, it is difficult to say how a more accurate representative sample of Hi Liter's potential clientele could be obtained. Defendant may challenge the survey through effective cross-examination, but its arguments do not make the survey or Mr. Buncher's testimony inadmissible.

### ii. Recognizability

Next, Defendant claims that Mr. Buncher's survey cannot be used to show Plaintiffs' recognizability because when the survey asked whether a participant recognized a Plaintiff, the survey did not give participants the opportunity to (1) identify Plaintiffs by name, or (2) provide a "don't know" answer. Defendant attempts to create a distinction between recognition and true recognition. Assertedly true recognition requires the participants name each Plaintiff. Defendant has not supported this assertion with case law. It is possible to recognize a person without recalling their name; and so the Court will not require the higher level of recognition to find the results are relevant to Plaintiffs' identifiability. Mr. Buncher also explained why he did not include a "don't know" response in the survey. He contends that these indefinite answers increase guessing and error variance. While this may be surprising to some, he states, "research studies now commonly accepted show that questions which exclude the 'don't know' option produce a greater volume of accurate data and have less response error than those that do." (Doc. 78–2 at 17 (first citing Dean Peabody, *Two components in bipolar scales: Direction and extremeness*, Psychological Review 69(2), 1969; then citing John R. Rossiter & Larry Percy, Advertising Communications and Promotion Management (McGraw-Hill, 2d ed. 1997) (emphasis in original).) Therefore, since Defendant questions the format of the questions, and Plaintiffs have shown by a preponderance that the format is reliable, the challenge goes to weight, not admissibility.

### iii. "Generally Accepted Standards"

#### 1. Control Group v. Control Question

Defendant also claims the survey is inadequate because there was no control group. Mr. Buncher explained that his survey was a communications study designed to evaluate what messages Defendant's advertisements communicated to the audience. Unlike a causal study, he claims, communications studies do not require a control group. In lieu of a control group, Mr. Buncher instead utilized a control question. The question was essentially an identical advertisement to the original one shown to the participants, minus the Plaintiffs' images. The survey then asked participants how the exclusion affected their perception of the advertisement. This, he claims, is "consistent with the logic of the Diamond research standard." (Doc. 28–2 at 11 (citing Sheri S. Diamond, Reference Guide on Survey Research, Reference Manual on Scientific Evidence, 359 (Federal Judicial Center, 3d ed. 2011).)

Defendant argues that Mr. Buncher misrepresented the Diamond research standard. Diamond, Defendant claims, actually found that a control question is less commonly used than a control group. Defendant also believes that contrary to Mr. Buncher's contention, his survey was not a communications study, but a causal study because it tested confusion *created* by the advertisements. Therefore, Mr. Buncher should have utilized the most common control method—the control group. Even considering the control question, however, Defendant claims it was inadequate because it did not allow the participant to indicate he or she was unsure of the response.

The District of Arizona has already concluded that Defendant's contentions are in error. The Court agrees with Arizona District Court Judge James A. Teilborg's conclusion in *Geiger v. Creative Impact Incorporated*; "Defendant cites no law for the proposition that a survey must be precluded as unreliable where there is no control group. This issue is one for the factfinder, not for the Court on a *Daubert* motion, as it is an asserted technical inadequacy that goes to weight, not admissibility." *Geiger*, No. CV–18–01443–PHX–JAT, 2020 WL 3268675, at *3 (D. Ariz. June 17, 2020) (first citing *Taylor v. Trapeze Mgmt., LLC*, No. 0:17–CV–62262–KMM, 2019 WL 1977514, at *3 (S.D. Fla. Feb. 28, 2019), then citing *Mattel Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998)). No

matter whether the control question was the best method available, Defendant has not shown that it was not a generally accepted method. And again, Mr. Buncher has explained that according to generally accepted principles, "don't know" answers encourage guessing. The Court finds this is an argument about Mr. Buncher's methods that goes to the weight given the survey.

2. Spelling Error and Dismissed Plaintiff

Defendant next claims that spelling errors changed the meaning of a survey question, "rendering the answers unreliable" (Doc. 78 at 10.) The question asked the participant to indicate his or her *strangest* impression about the advertisements, when it should have asked for the participant's *strongest* impression. In addition, Defendant believes the survey results are irrelevant because the survey showed participants images of four Plaintiffs instead of three. Though the original Complaint named four Plaintiffs, one was subsequently dismissed. This, Defendant claims, skewed the results. These are challenges to technical inadequacies and conclusions in the survey, but do not go to the survey's admissibility. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("[F]ollow-on issues of methodology, survey design, . . . critique of conclusions . . . go to the weight of the survey rather than its admissibility.").

iv. Relevance

Defendant then asserts that Mr. Buncher's survey does not demonstrate consumer confusion or recognition of Plaintiffs. It is therefore irrelevant to advancing Plaintiffs' case. Defendant believes that only the male survey participants' answers can be considered; and of those answers, only seven indicated that the participant believed a Plaintiff may be performing at Hi Liter. This is a criticism of Mr. Buncher's methods and the survey's design. Mr. Buncher's survey utilized more than three hundred participants and found a large percentage were confused about Plaintiffs' affiliation with, sponsorship of, and employment at Hi Liter. In addition, a portion of participants believed they recognized Plaintiffs. Defendant does not contradict Mr. Buncher's percentages but challenges his methods of arriving at these numbers. Plaintiffs have shown by a preponderance that the

survey results are relevant to consumer confusion and recognition, and Defendant raises arguments about methodology that is more appropriately addressed by a fact finder.

#### v. Prejudice

Finally, Defendant claims that the risk of unfair prejudice substantially outweighs the probative value of Mr. Buncher's testimony. It asserts that permitting the fundamentally flawed survey will be highly prejudicial. A court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. The Court disagrees; as noted, Defendant's methodological arguments go to the weight, not the admissibility. Any prejudice that may result can be sufficiently addressed through cross-examination and the counter testimony of Defendant's expert. In sum, Plaintiffs have shown that Mr. Buncher's survey and report are relevant; Mr. Buncher's testimony "logically advances a material aspect of" Plaintiffs' case. Moreover, Mr. Buncher is an expert in the field of media communications. Defendant's arguments amount to a plethora of challenges to methodology. Defendant may attack Mr. Buncher's methodology on cross-examination and through the testimony of its own expert.

### III.   Stephen Chamberlin

Plaintiffs retained Stephen Chamberlin to establish actual damages, that is, the fair market value of the right to use Plaintiffs' photographs in Defendant's advertisements. Mr. Chamberlin arrived at his amount using the hypothetical negotiation test. He first calculated each Plaintiff's day rate—how much they would have been paid to produce photographs for Defendant—and then multiplied the day rate by the number of Defendant's uses of the photograph. Mr. Chamberlin tailored his day rate assessments based on, among other factors, each Plaintiff's modeling career. Defendant challenges Mr. Chamberlin's conclusions on the basis that they are unreliable, irrelevant, and prejudicial.

#### a.   Reliability

Defendant first asserts that Mr. Chamberlin's opinions are unreliable because they are speculative, conclusory, and not grounded in principles governing fair market valuation in the Ninth Circuit. Specifically, Defendant argues that Mr. Chamberlin fails to base his

valuation on a comparable benchmark. It believes the appropriate market is one for pre-existing photographs not for photo shoots to produce photographs. Relatedly, Defendant highlights that Mr. Chamberlin did not explain why a full day rate for 8–10 hours is applicable here because Plaintiffs did not have to attend any such photo shoot.

Furthermore, Defendant argues that Mr. Chamberlin did not follow his own methodology—in which payment depends on the scope of the job and the intended uses—because he relies on Plaintiffs' past contracts with companies far bigger than Hi Liter and for modeling jobs far greater in scope than Defendant's use of Plaintiffs' photographs. It also claims that Mr. Chamberlin's comparison is false because a company like Hi Liter would negotiate downwards from companies like Playboy. Finally, Defendant asserts that the usage multiplier is unreliable because it accounts for each posting of a pre-existing image rather than a flat rate for all uses of the purchased image.

Plaintiffs counterargue that Mr. Chamberlin's assessment is properly based on his extensive experience negotiating contracts in the modeling industry. They also emphasize that Mr. Chamberlin used the same methodology in this case as he did in other cases where his conclusions were admitted. Furthermore, Plaintiffs critique the basis of Defendant's argument, asserting that models do not sell pre-existing images and, therefore, there is no market in which Plaintiffs would have been paid "to license use of an existing image." (Doc. 80 at 4.) Similarly, Plaintiffs contend that Mr. Chamberlin did not rely on an exact comparable benchmark because models like Plaintiffs have not appeared in advertisements for strip clubs; if they had, Plaintiffs state, Defendant would have produced past contracts in which it hired models to create advertisements. As a result, Plaintiffs underscore, it is immaterial that Plaintiffs did not need to attend a photo shoot to produce the photographs at issue here for Defendant because they would have done so were it not for Defendant's misappropriation of the images.

Plaintiffs further assert that the size of the company's audience is irrelevant because models are paid based on pre-negotiated rates whether the advertisements reach many or few people. Finally, Plaintiffs claim Mr. Chamberlin's opinions are not prejudicial merely

1   because the calculations do not offer the Defendant a "discount" (Doc. 93 at 11) and that
2   his reliance on a usage multiplier is an issue that must go to weight rather than
3   admissibility.

4         The Court finds that Mr. Chamberlin's valuation is sufficiently reliable. A party's
5   disagreement with the sources upon which the expert bases his or her conclusions goes to
6   the weight of the evidence and not to whether the evidence is admissible. *See Solis v.*
7   *Bridgestone Corp.*, No. CV–10–484–TUC–DCB, 2013 WL 12098802, at *3 (D. Ariz. Apr.
8   2, 2013) ("Questions related to the bases and sources of an expert's opinion . . . should be
9   left for the consideration of the finder of fact a[s] these questions affect the weight to be
10  assigned to an expert's opinion rather than its admissibility."). Defendant's arguments
11  regarding Mr. Chamberlin's determination of what constitutes a comparable benchmark,
12  as well as his use of the full day rate and his reliance on a usage multiplier, are challenges
13  to Mr. Chamberlin's chosen bases for his conclusions. As such, Defendant may attack them
14  on cross-examination. However, it must be for the fact finder to assess what impact this
15  has on the weight of Mr. Chamberlin's ultimate valuation.

16        *b. Relevance*

17        Defendant asserts that Mr. Chamberlin's conclusions are irrelevant because his
18  assessment was based on a hypothetical negotiation to create images, not to license the use
19  of pre-existing images. It explains that a hypothetical negotiated contract for a photo shoot
20  is not comparable to the use of photographs for which the Plaintiffs were already paid—as
21  is the case with Plaintiffs Pinder and Voronina—or never had to attend a photo shoot to
22  produce—as is the case with Plaintiff Cheri. Therefore, Defendant argues, Mr.
23  Chamberlin's valuation will not assist the finder of fact.

24        Furthermore, Defendant contends that Mr. Chamberlin omits the reasons behind his
25  methodology, i.e. why or how he calculated the day rate, why that rate varies per individual,
26  and why rates for different contracts would be the same. In Defendant's opinion, this
27  renders Mr. Chamberlin's conclusions "speculative and subjective." (Doc. 80 at 7.)
28        Plaintiffs counter that Mr. Chamberlin did not rely on the licensing of pre-existing

images because, in his experience, models do not negotiate such licensing contracts. Rather, they negotiate contracts for photo shoots to produce images for a specific purpose. Plaintiffs also underscore that Mr. Chamberlin's conclusions have been repeatedly endorsed by other courts in similar contexts.

The Court finds that Mr. Chamberlin's opinions are relevant. As discussed previously, his decisions to compare particular contracts and to calculate a full day rate are issues as to his sources that must be weighed by the fact finder. Moreover, Mr. Chamberlin's conclusions go to a material aspect of Plaintiffs' case—that is, the valuation of actual damages—and his opinions have a tendency to make Plaintiffs' determination of damages more probable than it would be without his analysis.

### c. Prejudice

Finally, Defendant argues that Mr. Chamberlin's testimony and report should be excluded under Federal Rule of Evidence 403. Rule 403 permits the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . ." Fed. R. Evid. 403. Defendant asserts that Mr. Chamberlin failed to account for the fact that Plaintiffs Pinder and Voronina have already been compensated for their photo shoots and Plaintiff Cheri never attended a photo shoot. Furthermore, Defendant takes issue with the fact that Mr. Chamberlin did not base his calculations on Plaintiff Cheri's subscription service, through which she sells access to her photographs. The failure to account for these facts, Defendant argues, is "grossly prejudicial" because Mr. Chamberlin's conclusions will mislead the jury into believing Plaintiffs are entitled to greater damages. (Doc. 80 at 2.)

Defendant also claims Mr. Chamberlin's damages calculations are faulty because his methodology allows Plaintiffs to be compensated twice and multiplies Plaintiffs' day rate by each usage of the photographs. This calculation, Defendant contends, is highly prejudicial and misleading. It urges the Court to follow *Toth v. 59 Murray Enters., Inc.*, 15-cv-8028, 2019 WL 95564, at *12 (S.D.N.Y. Jan. 3, 2019). In *Toth*, the court concluded that Mr. Chamberlin's valuation was flawed because plaintiffs were not entitled to a fair

market value for images that plaintiffs already sold. *Id.* The court further stated that "any theory of damages based upon the faulty notion that plaintiffs – as opposed to releasees – would be the willing sellers in a hypothetical transaction is fundamentally suspect." *Id.*

Plaintiffs reject the idea that Mr. Chamberlin's calculations are prejudicial simply because his valuation does not afford the Defendant a "discount" for the use of pre-existing photographs. (Doc. 93 at 11.) They explain that as models, Plaintiffs' job is to be paid for the creation of photographs. Therefore, had Defendant wanted to use Plaintiffs in advertisements, it would have had to hire Plaintiffs for a photo shoot just as the companies who already paid Plaintiffs Pinder and Voronina.

The Court disagrees that Mr. Chamberlin's valuation is unduly prejudicial. It is not enough that Mr. Chamberlin estimates higher damages than Defendant believes are warranted. Moreover, to the extent that Defendant's arguments regarding prejudice are a repetition of its concern over Mr. Chamberlin's methodology, the Court has already determined these are issues of weight for the fact finder.

Finally, the fact that Mr. Chamberlin bases his opinions on what Plaintiffs would have been paid to participate in a hypothetical photo shoot does not render those conclusions unduly prejudicial. It is not determinative for admissibility that Plaintiffs were compensated for the actual photo shoots that produced the images at issue. Mr. Chamberlin is of the opinion that, for Defendant to have lawfully used Plaintiffs' photographs, it would have had to hire Plaintiffs for a similar photo shoot. Therefore, this challenge to Mr. Chamberlin's report is more accurately described as a challenge to the sources used in his conclusions. The Court has already determined that such challenges are for the fact finder to weigh.

### IV.     Michael Einhorn

As stated previously, Plaintiffs have withdrawn their motion challenging Dr. Einhorn's role in this case. The Court, therefore, will deny Plaintiffs' motion as moot.

### V.     Conclusion

The Court finds that the parties have demonstrated by a preponderance of the

evidence that Mr. Buncher and Mr. Chamberlin's testimony are relevant and reliable. Each expert shall be permitted to testify to their expert opinions at trial.

Accordingly, IT IS ORDERED:

1) Defendant's Motion to Strike Report and Testimony of Martin Buncher is DENIED. (Doc. 78.)
2) Defendant's Motion to Strike Report and Testimony of Stephen Chamberlin is DENIED. (Docs. 80, 91.)
3) Plaintiff's Motion to Strike Report and Testimony of Michael Einhorn is DENIED as MOOT. (Doc. 79.)

Dated this 14th day of October, 2020.

_____
Honorable Raner C. Collins
Senior United States District Judge